IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHELE BORTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO.  4:17-cv-02209 |
| | § | |
| LOWE'S HOME CENTERS, LLC | § | |
| | § | |
| Defendant | § | |

**BORTON'S RESPONSE TO LOWE'S MOTION FOR SUMMARY JUDGMENT**

Mark J. Oberti
State Bar No. 00789951
S.D. Texas No. 17918
OBERTI SULLIVAN LLP
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
mark@osattorneys.com – Email

ATTORNEY-IN-CHARGE FOR PLAINTIFF

OF COUNSEL:

Edwin Sullivan
State Bar No. 24003024
S.D. Texas No. 24524
OBERTI SULLIVAN LLP
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
ed@osattorneys.com – Email

ATTORNEYS FOR PLAINTIFF

# TABLE OF CONTENTS

I.    SUMMARY ..................................................................................................1

II.   FACTUAL BACKGROUND ........................................................................3

      A.    Between 1997 And 2017, Borton Received Consistently Positive Annual
            Performance Reviews That Lauded Her Leadership Abilities.............................3

      B.    In February 2017, Borton Received A Positive Annual Review For 2016 That
            Lauded Her Leadership As The CDT Location Manager......................................4

      C.    In Early April 2017, Before Borton Requested FMLA Leave, Her New
            Manager, Brian McIntosh, Asked Her For Information About Three
            Employees In The Houston CDT; Borton Sent It To Him, And That Was The
            End Of It............................................................................................................5

      D.    On April 17, 2017, Borton Informed Brian McIntosh That She Needed
            Surgery, And Was Going To Be On FMLA Leave Starting June 1, 2017, For
            One To Four Weeks...........................................................................................6

      E.    Two Days After Borton Informed McIntosh Of Her Need For FMLA Leave,
            McIntosh And Lowe's HR Began Working To Build A Case Against Her To
            Fire Her On The Vague And Pretextual Grounds Of "Lack Of Leadership,"
            And Made The Decision To Fire Her Less Than A Month Later .........................7

      F.    After Having Already Decided To Fire Her, McIntosh Continued To Gather
            Dirt On Borton, In Order To *Post Hoc* Try To Make Her Termination Appear
            Justified ..........................................................................................................10

      G.    McIntosh And Lowe's Fired Borton On June 6, 2017, Nine Days Before Her
            FMLA Leave Was Scheduled To Begin............................................................11

      H.    Other Managers Who Worked For Borton Thought Highly Of Her
            Leadership, And Testified That Most Other Workers In The Houston CDT
            Did Too ...........................................................................................................12

      I.    McIntosh Falsely Told An Investigator At Lowe's That Before He
            Terminated Borton, He "Had Multiple Conversations With Borton On Her
            Leadership"; In Fact, He Had None; Then, McIntosh Continued His Pattern
            Of Deception In His Deposition .......................................................................13

      J.    Borton Had Her Scheduled Foot Surgery On June 15, 2017, And, Four
            Months Later, Started A New, Much Lower Paying, Job....................................14

K.   After Firing Borton, McIntosh Was Involved In Giving PIPs To Two Of The Three Other CDT Location Managers Who Had Issues With Leadership ..........14

III.   STANDARD OF REVIEW ...................................................................................15

IV.   CLAIMS FOR INTERFERENCE AND RETALIATION UNDER THE FMLA ..........15

A.   Law ...................................................................................................................16

B.   Analysis.............................................................................................................17

1.   Lowe's Violated The FMLA's Anti-Interference Provisions When It Terminated Borton Shortly After She Was Approved For FMLA Leave, And Nine Days Before The Leave Was To Begin.......................17

2.   Lowe's Retaliated Against Borton When It Fired Her Because She Had Scheduled Upcoming FMLA Leave .................................................20

a.   Borton Makes Out A *Prima Facie* Case Of FMLA Retaliation....20

b.   Borton Has Substantial Evidence Of Pretext ...............................22

i.   That Lowe's Gave A False Reason For Firing Borton Demonstrates Pretext........................................................22

ii.   An Analysis Of This Case Under *Ion v. Chevron* And *Laxton v. Gap* Demonstrates Pretext................................23

iii.   Here, As In *Starnes v. Wallace*, Considering "The Big Picture" There Is More Than Sufficient Proof Of Pretext To Survive Summary Judgment...........................26

iv.   Timing Also Proves Pretext.............................................28

v.   Disparate Treatment (Further) Proves Pretext .................29

V.   CONCLUSION....................................................................................................30

VI.   INDEX OF EXHIBITS ........................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Bocalbos v. National W. Life Ins. Co.*,
    162 F.3d 379 (5th Cir. 1998) ................................................................................16

*Burnett v. LFW, Inc.*,
    472 F.3d 471 (7th Cir. 2006) ...............................................................................19

*Burton v. Freescale Semiconductor, Inc.*,
    798 F.3d 222 (5th Cir. 2015) ............................................................... 21, 26, 28

*Caldwell v. KHOU-TV*,
    850 F.3d 237 (5th Cir. 2017) ........................................................................ 17, 28

*Cantu v. Vitol, Inc.*,
    Civil Action No. H-09-0576, 2011 WL 486289 (S.D. Tex. Feb. 7, 2011) .............21

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................................15

*Chaffin v. John H. Carter Co.*,
    179 F.3d 316 (5th Cir. 1999) ...............................................................................16

*Cuellar v. Keppel Amfels, L.L.C.*,
    731 F.3d 342 (5th Cir. 2013) ...............................................................................19

*EEOC v. Chevron Phillips Chemical Co.*, LP,
    570 F.3d 606 (5th Cir. 2009) ...............................................................................29

*Envtl. Conservation Org. v. City of Dallas*,
    529 F.3d 519 (5th Cir. 2008) ...............................................................................15

*Faris v. Williams WPC-I, Inc.*,
    332 F.3d 316 (5th Cir. 2003) ...............................................................................16

*Fordoche, Inc. v. Texaco, Inc.*,
    463 F.3d 388 (5th Cir. 2006) ...............................................................................15

*Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*,
    719 F.3d 356 (5th Cir. 2013) ...............................................................................22

*Heinsohn v. Carabin & Shaw, P.C.*,
    832 F.3d 224 (5th Cir. 2016) ...............................................................................23

*Hunt v. Rapides Healthcare Sys., LLC*,
    277 F.3d 757 (5th Cir. 2001) ......................................................................... 16, 20

*Ion v. Chevron,*
731 F.3d 379 (5th Cir. 2013) ........................................................................23

*Johnson v. Fifth Third Bank,*
685 Fed. Appx. 379 (6th Cir. 2017) ..............................................................21

*Jones v. Children's Hosp.,*
58 F. Supp. 3d 656 (E.D. La. 2014) ..............................................................19

*King v. Dogan,*
31 F.3d 344 (5th Cir. 1994) ............................................................................3

*Laxton v. Gap Inc.,*
333 F.3d 572 (5th Cir. 2003) ..................................................................25, 26

*Lee v. Kansas City S. Ry. Co.,*
574 F.3d 253 (5th Cir. 2009) ..................................................................21, 30

*Mauder v. Metropolitan Transit Authority of Harris Cty., Texas,*
446 F.3d 574 (5th Cir. 2006) ........................................................................20

*Metzler v. Fed. Home Loan Bank of Topeka,*
464 F.3d 1164 (10th Cir. 2006) ....................................................................21

*Nero v. Industrial Molding Corp.,*
167 F.3d 921 (5th Cir. 1999) ........................................................................16

*Patrick v. Ridge,*
394 F.3d 311 (5th Cir. 2004) ........................................................................23

*Satterfield v. Wal-Mart Stores, Inc.,*
135 F.3d 973 (5th Cir. 1998) ........................................................................16

*Smith v. Diffee Ford–Lincoln–Mercury, Inc.,*
298 F.3d 955 (10th Cir. 2002) ......................................................................19

*Spakes v. Broward County Sheriff's Office,*
631 F.3d 1307 (11th Cir. 2011) ....................................................................19

*Starnes v. Wallace,*
849 F.3d 627 (5th Cir. 2017) ..................................................................26, 28

*Wheat v. Florida Parish Juvenile Justice Comm.,*
811 F.3d 702 (5th Cir. 2016) ........................................................................29

*Wysong v. Dow Chem. Co.,*
503 F.3d 44 (6th Cir. 2007) ..........................................................................16

**STATUTES**

29 U.S.C. § 2601 *et seq.*..................................................................................30

29 U.S.C. § 2601(b)(2)......................................................................................16

29 U.S.C. § 2611(11) ...................................................................................18, 19

29 U.S.C. § 2611(4)(A)(I)..................................................................................17

29 U.S.C. § 2612(a)(1)(D)............................................................................17, 19

29 U.S.C. § 2615(a) ...........................................................................................19

29 U.S.C. § 2615(a)(1).......................................................................................16

29 U.S.C. §§ 2611(2)(A) & 2611(2)(B)(ii) ......................................................17

29 U.S.C. §§ 2615(a)(1)-(2) ..............................................................................16

**RULES**

Fed. R. Civ. P. 56(a) ..........................................................................................15

Fed. R. Civ. P. 56(c) ..........................................................................................15

**REGULATIONS**

29 C.F.R. § 825.115(a)........................................................................................18

29 C.F.R. § 825.115(a) (2) ..................................................................................19

29 C.F.R. § 825.115(a)(1) ...................................................................................19

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHELE BORTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO.  4:17-cv-02209 |
| | § | |
| LOWE'S HOME CENTERS, LLC | § | |
| | § | |
| Defendant | § | |

**BORTON'S RESPONSE TO LOWE'S MOTION FOR SUMMARY JUDGMENT**

## I.    SUMMARY

In 1997, Borton went to work for Lowe's (Borton's First Amended Complaint "Borton's Complaint," Doc. No. 13 at ¶ 9).  Over the following nineteen years, she was repeatedly promoted, and received consistently positive performance reviews (Borton Dep., Ex. 1 at 153-54; Borton's Complaint, Doc. No. 13 at ¶ 10).  By February 2016, Borton was the Location Manager of the Houston Central Delivery Terminal ("CDT") (Lowe's Responses to RFAs, Ex. 25 at 16). Lowe's only has four CDTs in America (*Id.* at 18).

In Borton's favorable performance review covering 2016, which was given to her on January 31, 2017, her second level supervisor wrote about the challenges she faced during 2016, and stated: "I am proud of the way that you demonstrated leadership to overcome these challenges."  (Borton's 2016 Performance Review, Ex. 4 at #001362).

On April 17, 2017, Borton notified her new immediate manager, Brian McIntosh, that she was scheduled to have a serious surgery on June 1, 2017 (which was later reset to June 15, 2017), and be off work "from 1 to 4 weeks" on FMLA leave (Email from Borton to McIntosh of 04/17/17,

Ex. 10; Lowe's Responses to RFAs, Ex. 25 at 47; McIntosh Dep., Ex. 2 at 44-45, 157).   Instead

of allowing her to take the FMLA leave, here is what happened:

- On April 19 and 20, 2017, McIntosh suddenly began building a secret file of stale, unverified, and meritless complaints on Borton (Email from Williams to McIntosh of 04/19/17, Ex. 11; Email from Williams to Mims and McIntosh of 04/20/17, Ex. 12; Email from Williams to Mims and McIntosh of 04/20/17, Ex. 13).

- On Wednesday, May 10, 2017, a Lowe's HR Director who supported and worked with McIntosh, Machell Mims, traveled to the Houston CDT, and, for the following three days, stimulated, solicited, and exaggerated a small handful of employee complaints.  She admits she does not know whether the complaints were valid (Mims Dep., Ex. 3 at 55; Mims Notes, Ex. 14).

- On Monday, May 15, 2017, Mims and McIntosh had a meeting, and McIntosh decided to fire Borton either that very day, or the next day (McIntosh Dep., Ex. 2 at 70-71; Ropchack Investigative Report, Ex. 21 at #000408).  This was less than a month after Borton had told McIntosh about her need for FMLA leave (Email from Borton to McIntosh of 04/17/17, Ex. 10).

- On May 18 and 19, 2017, after having already decided to fire Borton, McIntosh sent another Location Manager of a CDT, Mike Calzeretta, or a member of Calzeretta's team, to Houston, to gather dirt on Borton as part of a *post hoc* effort to obtain evidence to support his decision to fire her (Emails from Mike Calzeretta to McIntosh of 05/18/17 and 05/19/17, Ex. 17; Emails forwarded from Mims to McIntosh of 05/19/17, Ex. 18).

- On June 6, 2017 – nine days before Borton's scheduled surgery and FMLA leave – McIntosh terminated Borton on the pretext that she "lacked leadership" – something she had never been accused of before, and which Lowe's own contemporaneous documents refute (Borton's 2016 Performance Review, Ex. 4 at #001362).

- Borton was shocked, and rightly so:  (a) McIntosh admittedly never documented any concerns he supposedly had with Borton's leadership (McIntosh Dep., Ex. 2 at 131); and (b) McIntosh admitted that prior to June 6, 2017, he had not ever even orally "communicated to Borton that her leadership was lacking or unsatisfactory in any way." (McIntosh Dep., Ex. 2 at 125).

In September 2017 and February 2018, two of the other three CDT Location Managers had

leadership issues and other problems, and McIntosh was personally involved in deciding to give

them Performance Improvement Plans ("PIP"), whereas Borton was fired without first receiving a

PIP (PIP Given to Deegan on September 18, 2017, Ex. 22; PIP Given to Norquest on February 21,

2018, Ex. 23).    Unlike Borton, neither of these two CDT Location Managers were scheduled to begin FMLA leave at the time (McIntosh Dep., Ex. 2 at 142-45; Mims Dep., Ex. 3 at 70).

There is ample evidence from which a reasonable jury could conclude that Lowe's sudden termination of Borton on bogus charges that she "lacked leadership" after nearly twenty years of employment – and just nine days before her scheduled surgery and FMLA leave – was in violation of the FMLA's anti-interference and anti-retaliation provisions.  *See* 29 U.S.C. § 2601 *et seq*.    As such, Lowe's Motion for Summary Judgment must be denied.

## II.    FACTUAL BACKGROUND

### A.    Between 1997 And 2017, Borton Received Consistently Positive Annual Performance Reviews That Lauded Her Leadership Abilities

In October 1997, Borton began working for Lowe's as an hourly associate (Lowe's Responses to RFAs, Ex. 25 at 1; Borton's Complaint, Doc. No. 13 at ¶ 9).[1]  Throughout her career, Borton received positive annual performance evaluations (Borton Dep., Ex. 1 at 153).   Over the years, Borton worked her way up in the Company.   She eventually became a Regional Director over approximately 128 stores in three states (Borton Dep., Ex. 1 at 152).   She held that role for approximately four years (*Id*. at 153).   That position was eliminated in a Company-wide reorganization and, effective February 20, 2016, Borton was selected to become the Location Manager of Lowe's new CDT in Houston, Texas (Lowe's Responses to RFAs, Ex. 25 at 14-16).

The Houston CDT was opened by Lowe's as part of a pilot program that included four such terminals across the country (Lowe's Responses to RFAs, Ex. 25 at 18).    The others are in Charlotte, North Carolina, Charleston, South Carolina, and Syracuse, New York (McIntosh Dep., Ex. 2 at 11). The Houston CDT houses appliances to be delivered to customers seven days a week

---

[1] Because the factual allegations set forth in Borton's First Amended Sworn Original Complaint in paragraphs 9 to 25 were sworn to by Borton, they are admissible evidence.  *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).

(*Id*.).   Approximately 90 to 100 mostly hourly paid employees worked at the Houston CDT (Lowe's Responses to RFAs, Ex. 25 at 19; McIntosh Dep., Ex. 2 at 12-13; Mims Dep., Ex. 3 at 7, 19; Borton Dep., Ex. 1 at 171).

**B.     In February 2017, Borton Received A Positive Annual Review For 2016 That Lauded Her Leadership As The CDT Location Manager**

In her role as Location Manager of the Houston CDT, Borton initially reported to Lindsey Kroeger (Lowe's Responses to RFAs, Ex. 25 at 22; Borton Dep., Ex. 1 at 38-39).   On January 31, 2017, Kroeger gave Borton a positive review for 2016 (Borton's 2016 Performance Review, Ex. 4 at #001363; Lowe's Responses to RFAs, Ex. 25 at 23-25).   The review concluded with an overall rating of Borton of "Solid Performance," and rated her as being "on track" in the categories of "Servant Leadership" and  "Leadership Behavior."  (Borton's 2016 Performance Review, Ex. 4 at #001362).   Kroeger's supervisor at the time, Michael D. McCurry, stated in Borton's review that:

> Starting up a new field operation is always a challenging leadership assignment.  In your case it was even more difficult because 3PL delivery processes and systems were still in "Pilot" phase, not to mention the fact that this was your first CST.  **I am proud of the way that you demonstrated leadership to overcome these challenges.**  Thank you for your hard work in 2016.  I want you to know that we are glad that you are part of the Central Delivery Team.

(*Id*.) (bold added).[2]

In late February 2017, Brian McIntosh replaced Kroeger as Borton's manager (Borton Dep., Ex. 1 at 64; McIntosh Dep., Ex. 2 at 14).   McIntosh was the Director of Central Delivery Network (McIntosh Dep., Ex. 2 at 19).   McIntosh worked from Lowe's Corporate Headquarters, in Mooresville, North Carolina (Lowe's Responses to RFAs, Ex. 25 at 19).    The Location Managers of each of the four CDTs reported to him (McIntosh Dep., Ex. 2 at 15).   Borton interacted

---

[2] Because of her positive 2016 performance review,  Borton received an approximately $8,000.00 bonus in mid-March 2017, and a raise to approximately $109,000.00 a year in late March (Lowe's Responses to RFAs, Ex. 25 at 32-33; Borton Dep., Ex. 1 at 154-55).

with McIntosh via text, e-mail, and phone (Lowe's Responses to RFAs, Ex. 25 at 30; McIntosh

Dep., Ex. 2 at 22-24).[3]

**C.    In Early April 2017, Before Borton Requested FMLA Leave, Her New Manager, Brian McIntosh, Asked Her For Information About Three Employees In The Houston CDT; Borton Sent It To Him, And That Was The End Of It**

On April 3, 2017, McIntosh asked Borton to recap situations involving three ex-employees

in the Houston CDT (McIntosh Dep., Ex. 2 at 27).  On April 5, 2017, Borton sent McIntosh, and

an HR Director, Dana Williams, the recap of the three ex-employees' situations (E-mail from

Borton to Williams and McIntosh of 04/05/17, Ex. 5 at #000204), as follows:

- Eric Earthly, who had claimed another manager in Houston had treated him differently (*Id.* at #000205).  Borton explained that the terminal's camera system refuted his claim, and that Earthly resigned immediately before he was to be give a final warning for attendance issues (*Id.*).  McIntosh testified that he accepted this explanation, and that this matter played no part in the decision later on to terminate Borton (McIntosh Dep., Ex. 2 at 29-32).

- Ashley Mack, who had resigned (*Id.*).  Borton explained that Mack resigned to move to Louisiana, where her husband and other family lived (*Id.*).  McIntosh testified that he accepted this explanation, and that this matter played no part in the decision later on to terminate Borton (McIntosh Dep., Ex. 2 at 32-34).

- Neckia White, who had just given notice of her resignation, and, as she resigned, complained that she was being treated differently than others (*Id.* at #000206).  Just a week earlier, McIntosh texted Borton in response to her proposed handling of White's resignation, stating that it was "perfect."  (Texts Between Borton and McIntosh of 03/29/17, Ex. 6 at #000308).  Borton explained that White was on a Final Warning for Safety Violations that another HR Director, Machell Mims, had reviewed and approved to be given to her (*Id.*).  Borton also explained that White was on a PIP that was approved by HR (*Id.*).  McIntosh testified that he accepted this explanation, and that this matter played no part in the decision later on to terminate Borton (McIntosh Dep., Ex. 3 at 34-37).

---

[3] In its responses to Borton's Requests for Admissions, Lowe's initially denied that McIntosh interacted with Borton via text (Lowe's Responses to RFAs, Ex. 25 at 30).  But Borton produced her text messages with McIntosh (All The Text Messages Between Borton and McIntosh That Borton Had, Ex. 6).  The text messages are not consistent with the story Lowe's is telling now about Borton, which likely explains why Lowe's initially denied they existed (*Id.*).  Later, on June 29, 2018, during McIntosh's deposition, he admitted he had text messages with Borton, and testified that he had just given them to Lowe's counsel (McIntosh Dep., Ex. 2 at 24-25).  The text messages would be responsive to requests for production Borton served on Lowe's in October 2017 – some eight months before McIntosh's deposition.  Inexplicably, however, to this very day, Lowe's has never produced those text messages.

**D.    On April 17, 2017, Borton Informed Brian McIntosh That She Needed Surgery, And Was Going To Be On FMLA Leave Starting June 1, 2017, For One To Four Weeks**

In late March or April 2017, Borton learned she needed surgery (Borton's Complaint, Doc. No. 13 at ¶ 14).  For a few months, a painful mass had been growing on her left foot (*Id.*).  On January 26, 2017, Borton saw Dr. Brian Conley.  Dr. Conley told Borton she needed an MRI (*Id.*).  After she got the MRI, Dr. Conley told Borton that the mass needed to be removed, and until that occurred, it could not be determined if the mass was cancerous or benign (*Id.* at ¶ 15).  Dr. Conley indicated that, after the surgery, Borton would be unable to walk or work for approximately a month (*Id.*; *see also* Certification of Health Care Provider for Medical Leave, Ex. 9).  As a result, Borton applied for FMLA leave and provided ReedGroup, Lowe's outsourced FMLA administrator, the necessary medical certification to justify a FMLA leave (*Id.*).

On April 11, 2017, Borton's FMLA leave request was approved in writing by ReedGroup (Letter from ReedGroup to Borton of 04/11/17, Ex. 8).    According to ReedGroup's notice, her leave was to begin on June 1, 2017, the date she was to have the surgery, and was expected to last for one month (Letter from ReedGroup to Borton of 04/11/17, Ex. 8; Certification of Health Care Provider for Medical Leave, Ex. 9; Lowe's Responses to RFAs, Ex. 25 at 46).  Lowe's approved her FMLA request for the leave of absence to begin on June 1, 2017 (*Id.*).

On April 17, 2017, Borton informed McIntosh by email about her medical problem, and that she would be needing surgery on June 1, 2017, to remove the mass on her foot (Email from Borton to McIntosh of 04/17/17, Ex. 10; Lowe's Responses to RFAs, Ex. 25 at 47).  She informed McIntosh that after the surgery she would be out "from 1 to 4 weeks."  (Lowe's Responses to RFAs, Ex. 25 at 53).  McIntosh received Borton's email, but never responded to it (McIntosh Dep., Ex. 2 at 44-45).  McIntosh admitted that he knew that Borton's leave would be FMLA leave (*Id.* at 157).  Borton testified that McIntosh never reached out to her to discuss how her position would

be covered while she was out on FMLA leave (Borton Dep., Ex. 1 at 155). That is very unusual: Borton testified that during her career, whenever an important employee was going to be out for a substantial period of time, there was a discussion with them about what would be done to cover for them (Borton Dep., Ex. 1 at 155-56).

Prior to informing McIntosh about her need for FMLA leave on April 17, 2017, Borton and McIntosh had texted and emailed back and forth for months (Borton Dep., Ex. 1 at 127-28, 176; All Texts Borton had between herself and McIntosh, Ex. 6; Emails between Borton and McIntosh, Ex. 7). Not one of those texts or emails reflect any significant concern by McIntosh about Borton's leadership (McIntosh Dep., Ex. 2 at 47-48; Borton Dep., Ex. 1 at 176-78; All Texts Borton had between herself and McIntosh, Ex. 6; Emails between Borton and McIntosh, Ex. 7). Indeed, McIntosh admits that he never documented any supposed significant leadership deficiencies by Borton (McIntosh Dep., Ex. 2 at 131).

**E.      Two Days After Borton Informed McIntosh Of Her Need For FMLA Leave, McIntosh And Lowe's HR Began Working To Build A Case Against Her To Fire Her On The Vague And Pretextual Grounds Of "Lack Of Leadership," And Made The Decision To Fire Her Less Than A Month Later**

After April 17, 2017, things quickly and dramatically changed. On April 19, 2017 – just two days after Borton informed McIntosh about her upcoming FMLA leave – HR Director Dana Williams sent McIntosh an e-mail expressing concerns about Borton's relationship with her local HR Coach, Myra Jones (Email from Williams to McIntosh of 04/19/17, Ex. 11).[4] Williams copied Mims on the email (*Id.*). Williams email included a chain between herself and Jones indicating that she had stimulated Jones to send her the email giving rise to her concerns earlier that very same day (*Id.*).

---

[4] Borton testified that from her experience as a manager for many years at Lowe's, Lowe's HR department is sent notice of an employee's upcoming FMLA leave, and thus HR would have had notice of her upcoming FMLA leave (Borton Dep., Ex. 1 at 48-49; Borton Aff., Ex. 32 at ¶ 19).

The next day, April 20, 2017 – just three days after Borton informed McIntosh about her upcoming FMLA leave – Dana Williams sent McIntosh and Mims an email with an attached statement from an employee in the Houston CDT named Greg Lyons, falsely complaining about Borton (Email from Williams to Mims and McIntosh of 04/20/17, Ex. 12).  Lyons had sent the email to Williams and Mims on March 13, 2017 – more than a month earlier – and until April 20, 2017, they had not brought it to Borton's attention, to McIntosh's attention, or taken any action in response to it (Borton Dep., Ex. 1 at 157-58; McIntosh Dep., Ex. 2 at 50-52; Mims Dep., Ex. 3 at 29).  Lyons was someone whom Borton had previously declined to promote (Borton Dep., Ex. 1 at 156-57).  Lyons was later fired for sexual harassment (Mims Dep., Ex. 3 at 29).  At no time prior to firing Borton did McIntosh, Mims, or anyone else ever bring Lyons' complaint up to Borton (McIntosh Dep., Ex. 2 at 51-52; Mims Dep., Ex. 3 at 29; Borton Dep., Ex. 1 at 157-58).  Borton only learned of the complaint after she filed suit, and received responses to her requests for production (Borton Dep., Ex. 1 at 157-58).  This is unusual, because Lowe's normal practice is to discuss concerning issues with the relevant employee or manager before taking any action based on those concerns (Borton Dep., Ex. 1 at 158).  McIntosh and Mims admitted that they do not know if Lyons' complaint – or any other – was valid (McIntosh Dep., Ex. 2 at 56, 73; Mims Dep., Ex. 3 at 55).

Also, on April 20, 2017 – just three days after Borton informed McIntosh about her upcoming FMLA leave – Dana Williams sent McIntosh and Mims an email with many attachments from by now former employee Neckia White, falsely complaining about Borton (Email from Williams to Mims and McIntosh of 04/20/17, Ex. 13).  White had sent the email to Williams and Mims on March 17, 2017 – more than a month earlier – and, as noted above, Borton had already responded to McIntosh's post-March 17, 2017 request for a recap concerning White, and McIntosh

had referred to her handling of White's resignation as "perfect" in a text (Texts Between Borton and McIntosh of 03/29/17, Ex. 6 at #000308; E-mail from Borton to Williams and McIntosh of 04/05/17, Ex. 5 at #000206).  After digging up this previously dead and buried issue among themselves, neither McIntosh, Williams, Mims, or anyone else ever reverted back to Borton yet again to ask her anything else about White (Borton Dep., Ex. 1 at 165; McIntosh Dep., Ex. 2 at 62-63; Mims Dep., Ex. 3 at 30).

On May 10, 11, and 12 – just three weeks after Borton informed McIntosh about her upcoming FMLA leave – Mims traveled to the Houston CDT (Mims Dep., Ex. 3 at 27).  Mims was sent after what she and McIntosh called a "collaborative" discussion (Mims Dep., Ex. 3 at 28; McIntosh Dep., Ex. 2 at 63).  Mims had been to the Houston CDT twice before Borton requested FMLA leave, and never reported back any problems (Mims Dep., Ex. 3 at 12-15).

Mims talked to various groups of employees in the center, on both the day shift and the night shift (Mims Dep., Ex. 3 at 33-38).   According to Mims, some employees expressed satisfaction with the local leadership, and some expressed dissatisfaction (Mims Dep., Ex. 3 at 78; Mims' Notes, Ex. 14).  Out of the 90 to 100 employees in the terminal, Mims testified that she cannot say how many expressed unhappiness (Mims Dep., Ex. 3 at 44).[5]

Before Mims left the Houston CDT on Friday, May 12, 2017, she talked to Borton, and did not tell Borton anything that would suggest to her that her job was in grave jeopardy (Mims Dep., Ex. 3 at 77; Borton Dep., Ex. 1 at 174).  Later that same day, Mims emailed McIntosh and told him that her interviews with the day shift employees caused her concern (Email from Mims to

---

[5] There is reason to believe that Mims intentionally whipped up and exaggerated complaints with employees.  For example, a since terminated manager, JD Densmore, who was with Mims, told Borton that he had never seen anything like what Mims had done with a group of employees before, and he would need time to wrap his mind around it (Borton Dep., Ex. 173).  And, Mims purported to quote Whitney Gibbs as saying negative things about Borton, but Gibbs provided an affidavit that spoke glowingly about Borton (Affidavit of Whitney Gibbs, Ex. 29).

McIntosh of 05/12/17, Ex. 15).  Mims did not, however, indicate that she thought Borton should be fired (*Id.*).  Rather, Mims asked the Employee Relations group to conduct an Employee Advocacy Visit to more fully understand the morale at the Houston CDT (Email from Mims to McIntosh of 05/12/17, Ex. 15; Mims Dep., Ex. 3 at 46-47).

Instead of conducting the Employee Advocacy Visit, Mims and McIntosh had an in-person meeting on Monday, May 15, 2017, and McIntosh decided to fire Borton either that day, or the next day (McIntosh Dep., Ex. 2 at 70-71, 113; Ropchack Investigative Report, Ex. 21 at #000408; Mims Dep., Ex. 3 at 48).  McIntosh made the decision to terminate Borton less than one month of learning on April 17, 2017, that she needed to take FMLA leave (Lowe's Responses to RFAs, Ex. 25 at 53; McIntosh Dep., Ex. 2 at 70-71).

## F.  After Having Already Decided To Fire Her, McIntosh Continued To Gather Dirt On Borton, In Order To *Post Hoc* Try To Make Her Termination Appear Justified

On May 18 and 19, 2017, Lowe's documents reflect that McIntosh was still working to gather dirt on Borton in a *post hoc* effort to obtain evidence to support his decision to fire her (Emails from Mike Calzeretta to McIntosh of 05/18/17 and 05/19/17, Ex. 17; Emails forwarded from Mims to McIntosh of 05/19/17, Ex. 18).

Around this same time, McIntosh told Borton that she was needed to attend a meeting of the four Location Managers at the Company's headquarters in Mooresville, North Carolina, on June 6, 2017, and therefore she needed to change her surgery date of June 1, 2017 (Borton's Complaint, Doc. No. 13 at ¶ 17).  Borton then changed her surgery date to June 15, 2017, and informed McIntosh that she had done so (*Id.*).

On Thursday, June 1, 2017, Borton showed up to work and learned that access to her e-mails, and all the Company's computer systems, had been cut off.  Borton was informed by the HR Department at the Company's headquarters that its paperwork showed that her FMLA leave

began on June 1, 2017, and it cut off her access because it believed that she had begun her FMLA leave that day (Borton's Complaint, Doc. No. 13 at ¶ 18; McIntosh Dep., Ex. 2 at 103).   Thus, Lowe's HR Department, which Mims was a part of, had obviously been put on notice of her FMLA leave back in April 2017, which is consistent with how Borton testified the process worked in her experience (Borton Dep., Ex. 1 at 48-49).[6]

## G.   McIntosh And Lowe's Fired Borton On June 6, 2017, Nine Days Before Her FMLA Leave Was Scheduled To Begin

On Tuesday, June 6, 2017, McIntosh showed up with Mims to Plaintiff's workplace in Houston (Lowe's Responses to RFAs, Ex. 25 at 86).  This is the first time that Borton had ever met McIntosh in person (*Id*. at 87).   McIntosh told Borton that she was being terminated immediately for "lack of leadership."  (McIntosh Dep., Ex. 2 at 106; Borton's Complaint, Doc. No. 13 at ¶ 20).   Borton was flabbergasted (*Id*.; Borton Dep., Ex. 1 at 51-52).  McIntosh admittedly had never documented any significant dissatisfaction with Borton's leadership (McIntosh Dep., Ex. 2 at 131).   Moreover, McIntosh admittedly had never previously even orally "communicated to Borton that her leadership was lacking or unsatisfactory in any way." (McIntosh Dep., Ex. 2 at 125, 131; Lowe's Responses to ROGs, Ex. 26 at No. 7;[7] *see also* Borton Dep., Ex. 1 at 135 (confirming that no supervisor ever told her that her leadership was lacking).

---

[6] Around this same time, ReedGroup sent Borton a notice indicating that she was eligible for FMLA leave as requested and rescheduled between June 15, 2017 and July 15, 2017 (Reed Group Notice of 06/01/17, Ex. 19).  This was a mere formality, as Borton had already done everything necessary to be certified for FMLA leave on June 1, 2017, and had been approved for that leave (Lowe's Responses to RFAs, Ex. 25 at 85).

[7] Lowe's failed and refused for more than eight months to provide a verification for its original interrogatory responses despite being asked to do so in writing by Borton's counsel nine separate times during that time. *See* Ex. 27.  Lowe's did not produce any such verification until just seven days ago, when, at the same time, it "supplemented" its interrogatory responses. *See* Ex. 33.

**H.**     **Other Managers Who Worked For Borton Thought Highly Of Her Leadership, And Testified That Most Other Workers In The Houston CDT Did Too**

To help run the terminal, Borton had four to six Operations Managers or Coaches at any one time (Borton Dep., Ex. 1 at 27-28).  One of them was Melanie Fore (Borton Dep., Ex. 1 at 29). Fore testified as follows about Borton and her leadership abilities:

> I thought Borton's management and leadership style was excellent.   Borton was very business minded.  She knew Lowe's policies and procedures very well, and followed them carefully.   Borton knew exactly how to run the business.  She was very good with people.  One of the best things about her as a manager was that she was very consistent with how she treated everyone.  She was firm but fair with everyone.  She did not play favorites.  She had the same expectations for all the employees, and she held everyone equally accountable.  She was also very respectful of all the employees in the CDT.
>
> **I talked to many other employees in the CDT, who also thought that Borton's management and leadership style was very good and motivational.  My strong sense is that is how most of the employees felt about Borton.**   Borton worked very long hours, and worked very hard.  She also led by example . . . .

(Affidavit of Melanie Fore, Ex. 29) (bold added).

Another one of Borton's Operations Managers or Coaches was Whitney Gibbs (Borton Dep., Ex. 1 at 29).  Gibbs testified as follows about Borton and her leadership abilities:

> I thought Borton's management and leadership style was very good.  **I talked to many other employees in the CDT, and they also thought that Borton's management and leadership style was very good and motivational.**   Borton worked very long hours, and worked very hard.  She led by example, which is what I think a good leader does.  I preferred Borton over the individuals that came on to lead the Houston CDT after she was terminated.  I thought Borton was a better manager.  She knew the Company more, she motivated her employees better, and she worked harder.  I left Lowe's in 2018.

(Affidavit of Whitney Gibbs, Ex. 29) (bold added).

Another one of Borton's Operations Managers or Coaches was Richard Fontenot (Affidavit of Richard Fontenot, Ex. 30 at ¶ 2).  Fontenot testified as follows about Borton and her leadership abilities:

-12-

From February 2016 on, I interacted with Ms. Borton every day until my employment with Lowe's ended in January 2017.   I thought Ms. Borton's management and leadership style was great.  **I talked to many other employees in the Central Delivery Terminal, and they also all thought that Ms. Borton's management and leadership style was great.**  Ms. Borton was very open, family oriented, and supportive.  She was never abusive or harsh.  She also allowed her managers, like me, to manage their team without micromanaging us, yet at the same time provided appropriate support and guidance.

(Affidavit of Richard Fontenot, Ex. 30 at ¶¶ 4-5) (bold added).

I.      **McIntosh Falsely Told An Investigator At Lowe's That Before He Terminated Borton, He "Had Multiple Conversations With Borton On Her Leadership"; In Fact, He Had None; Then, McIntosh Continued His Pattern Of Deception In His Deposition**

Immediately after Borton was terminated, she lodged an internal complaint, alleging that she was terminated because she was scheduled to take FMLA leave (Borton Dep., Ex. 1 at 144-45; Ropchack Investigative Report, Ex. 21 at #000408).   Her complaint was assigned to Christopher Ropchack, a Lowe's Employee Relations Consultant (*Id.*).    Ropchak interviewed McIntosh (Ropchack Investigative Report, Ex. 21 at #000408).  In the interview, McIntosh told Ropchak that, "he had multiple conversations with Borton on her Leadership . . . ." (Ropchak Investigative Report, Ex. 21 at #000409-000410).   Accordingly, Ropchak rejected Borton's complaint (Ropchack Investigative Report, Ex. 21 at #000409-000410).   However, what McIntosh told Ropchak is false:  McIntosh himself admitted that prior to June 6, 2017, he had not ever even orally "communicated to Borton that her leadership was lacking or unsatisfactory in any way." (McIntosh Dep., Ex. 2 at 125; Lowe's Responses to ROGs, Ex. 26 at No. 7; *see also* Borton Dep., Ex. 1 at 135 (confirming that no supervisor ever told her that her leadership was lacking)).

At his deposition, McIntosh continued his pattern of deception.  McIntosh claimed that Borton had an unusually large number of Employee Complaints made against her through the Company's EthicsPoint Hotline – more than any of the other three CDT Location Manager (McIntosh Dep., Ex. 2 at 137).  But, McIntosh admitted that he never saw one of those supposed

complaints, and Lowe's has never produced any proof that even one complaint was made against Borton through its EthicsPoint Hotline (*Id*. at 137, 141-42).  Such complaints are routed to the HR Department, and Mims – an HR Director – testified that she has never seen even one such complaint against Borton (Mims Dep., Ex. 3 at 17).

**J.      Borton Had Her Scheduled Foot Surgery On June 15, 2017, And, Four Months Later, Started A New, Much Lower Paying, Job**

 Borton had the foot surgery as scheduled on June 15, 2017 (Borton's Complaint, Doc. No. 13 at ¶ 23).  The painful mass that had been growing on her left foot was removed by Dr. Conley, and was tested (*Id*.)  It luckily turned out not to be cancerous (*Id*.).  In September 2017, Borton accepted a position as an Operations Manager with Pacific Dental Services, LLC, earning an annualized salary of approximately $58,000.00, which is approximately $51,000.00 per year less than her annualized salary at Lowe's (not to mention the bonuses and other benefits that Borton received at Lowe's that she may not receive at Pacific Dental Services, LLC) (*Id*. at ¶ 25).

**K.      After Firing Borton, McIntosh Was Involved In Giving PIPs To Two Of The Three Other CDT Location Managers Who Had Issues With Leadership**

Borton testified that, from her experience at Lowe's, if management really believed in good faith that she had leadership issues, she would have been placed on a PIP, not summarily fired (Borton Dep., Ex. 1 at 178).  The facts bear that out.  The CDT Location Manager in Syracuse, New York, Eric Deegan, experienced performance problems in numerous areas, including leadership (PIP Given to Deegan on September 18, 2017, Ex. 22).   Accordingly, in September 2017, McIntosh participated in the decision to put Deegan on a 90-day PIP (McIntosh Dep., Ex. 2 at 143; PIP Given to Deegan on September 18, 2017, Ex. 22).  Deegan successfully completed the PIP, and remains employed at Lowe's (McIntosh Dep., Ex. 2 at 143).  Unlike Borton, Deegan was not scheduled to take FMLA Leave at the time he was put on his PIP (McIntosh Dep., Ex. 2 at 143-44; Mims Dep., Ex. 3 at 70).

The CDT Location Manager in Charleston, South Carolina, Brittany Norquest, experienced performance problems in numerous areas, including leadership (PIP Given to Norquest on February 21, 2018, Ex. 23).   Accordingly, in February 2018, McIntosh approved the decision to put Norquist on a 90-day PIP (McIntosh Dep., Ex. 2 at 144-45; PIP Given to Norquest on February 21, 2018, Ex. 23).   Norquest successfully completed the PIP, and remains employed at Lowe's. Unlike Borton, Norquest was not scheduled to take FMLA Leave at the time she was put on the PIP (McIntosh Dep., Ex. 2 at 145; Mims Dep., Ex. 3 at 70).

## III.    STANDARD OF REVIEW

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).   The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).   If the party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c).   The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant.   *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008).

## IV.    CLAIMS FOR INTERFERENCE AND RETALIATION UNDER THE FMLA

On July 19, 2017, Borton filed this lawsuit (Doc. No. 1).   On October 10, 2017, Borton filed her First Amended Sworn Complaint (Doc. No. 13).   Borton alleges causes of action for FMLA interference and retaliation (*Id.* at ¶¶ 30-41).   As set forth below, they both survive summary judgment scrutiny.

### A. Law

The FMLA and its regulations set forth rules for employers to follow that are detailed, comprehensive, and completely contrary to the "at-will" employment rule. See *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 977 (5th Cir. 1998) ("It goes without saying that the FMLA makes incredible inroads on an at-will employment relationship, such as Satterfield's with Wal-Mart."). The FMLA was enacted to permit employees to take up to twelve weeks per year of job-protected leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition. 29 U.S.C. § 2601(b)(2).

"The FMLA has two distinct sets of provisions, which together seek to meet the needs of families and employees and to accommodate the legitimate interests of employers." *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 763 (5th Cir. 2001) (citing *Nero v. Industrial Molding Corp.*, 167 F.3d 921, 927 (5th Cir. 1999) *Bocalbos v. National W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998)). The first set of provisions are prescriptive: They create a series of substantive rights, namely, the right to take up to twelve weeks of unpaid leave under certain circumstances. *Id.* For example, the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA right. 29 U.S.C. § 2615(a)(1). "If an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007). The provisions in the second set are proscriptive: They bar employers from penalizing employees and other individuals for exercising their rights. *Id.*; *see also* 29 U.S.C. §§ 2615(a)(1)-(2); *Faris v. Williams WPC-I, Inc.*, 332 F.3d 316, 320-22 (5th Cir. 2003) (holding that there is a distinction between substantive FMLA rights and causes of action for retaliation designed to protect those rights); *Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319 (5th Cir. 1999); *Bocalbos*, 162 F.3d at

383 ("[T]he Act protects employees from interference with their leave as well as against discrimination or retaliation for exercising their rights.").

**B.     Analysis**

> **1.     Lowe's Violated The FMLA's Anti-Interference Provisions When It Terminated Borton Shortly After She Was Approved For FMLA Leave, And Nine Days Before The Leave Was To Begin**

In establishing an interference claim, a plaintiff must demonstrate the following: (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave the employer notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled. *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017). Borton fulfills all five elements.

<u>First element</u>. An employee is eligible for FMLA leave when he or she has worked for his or her employer at least twelve months, and worked "at least 1,250 hours of service with his employer during the previous 12-month period," excluding any employee who is employed at a worksite at which, or within 75 miles of which, the employer employs less than 50 employees. 29 U.S.C. §§ 2611(2)(A) & 2611(2)(B)(ii). Lowe's admitted in its live Answer that Borton satisfies this element (Docket Entry No. 16 at ¶ 31).

<u>Second element</u>. To be a "covered employer" under the FMLA, a business must "employ 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 U.S.C. § 2611(4)(A)(I). Lowe's admitted in its live Answer that Borton satisfies this element (Docket Entry No. 16 at ¶ 32).

<u>Third element.</u> An eligible employee such as Borton is entitled to FMLA leave of up to 12 weeks of unpaid leave each year for a "serious health condition" that makes the employee unable to perform the functions of his job. 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that

involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). 29 C.F.R. § 825.115(a) provides that a serious health condition includes a period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

> (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or

> (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

> (3) The requirement in paragraphs (a)(1) and (2) of this section for treatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity.

Under this test, Borton would have suffered a serious health condition between the date of her surgery and 30 days later because, inter alia, as Dr. Conley indicated, she would have been incapacitated as a result of her serious health condition, or treatment therefore, for more than three consecutive days and would have received treatment by a health care provider two or more times within 30 days of the first day of incapacity (FMLA Certification Information Sent from Borton to ReedGroup on 04/28/17, Ex. 9 at #000139-000140). As a result of Dr. Conley's conclusions and recommendations, ReedGroup approved Borton's requested FMLA leave, thus demonstrating that it too recognized that Borton was entitled to FMLA leave based on 29 C.F.R. § 825.115(a)'s definition of a serious health condition (ReedGroup Notice of FMLA Eligibility to Borton of 04/11/17 for Leave Starting 06/01/17, Ex. 8; ReedGroup Notice of FMLA Eligibility to Borton of 06/01/17 for Leave Starting 06/15/17, Ex. 19). And, as it actually turned out, Borton did in fact receive in office treatment from Dr. Conley two or more times within 30 days of the first day of

-18-

incapacity (June 15, 2017), and the first in-person visit was on June 22, 2017, which is within seven days of the first day of incapacity (Borton's Complaint, Doc. No. 13 at ¶ 24). As such, it is undisputed that Borton's anticipated leave was for a FMLA-covered "serious health condition," because she had "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider." 29 U.S.C. § 2611(11). *See also* 29 C.F.R. § 825.115(a)(1) and (2).

**Fourth element**. The FMLA's notice requirements "are not onerous" and are satisfied when an employee provides his employer with information sufficient to show that she "likely has an FMLA-qualifying condition." *See Burnett v. LFW, Inc*., 472 F.3d 471, 477 (7th Cir. 2006). Lowe's admitted that Borton had already done everything necessary to be certified for FMLA leave, and had been approved for that leave (Lowe's Responses to RFAs, Ex. 25 at 46, 85).

**Fifth element**. Borton had an entitlement under the FMLA to take job-protected time off to care for herself. The FMLA guarantees eligible employees a total of twelve weeks of leave in a one-year period when the leave relates to the employee's serious health condition. 29 U.S.C. § 2612(a)(1)(D). Lowe's violated the FMLA by firing Borton for wanting to take time off for her own serious health condition, and fired her just nine days before her rescheduled leave was to begin (Lowe's Responses to RFAs, Ex. 25 at 92-94). This violates the law's proscription against "interfere[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right" provided by the FMLA. 29 U.S.C. § 2615(a). Hence, Lowe's violated the FMLA's anti-interference provision.[8] As set forth below, Lowe's also illegally retaliated against Borton.

---

[8] Interference claims "do not require a showing of discriminatory intent" – the plaintiff must prove only an act of interference. *Cuellar v. Keppel Amfels, L.L.C.,* 731 F.3d 342, 350 (5th Cir. 2013) (Elrod, J., concurring); *accord Smith v. Diffee Ford–Lincoln–Mercury, Inc*., 298 F.3d 955, 960 (10th Cir. 2002) ("If an employer interferes with the FMLA-created right to medical leave ... [this] is a violation regardless of the employer's intent."); *Jones v. Children's Hosp*., 58 F. Supp. 3d 656, 668 (E.D. La. 2014) (same). However, employers can assert lack of causation as an affirmative defense. *Spakes v. Broward County Sheriff's Office*, 631 F.3d 1307, 1309 (11th Cir. 2011). Thus, if Lowe's could

2.    **Lowe's Retaliated Against Borton When It Fired Her Because She Had Scheduled Upcoming FMLA Leave**

a.    **Borton Makes Out A *Prima Facie* Case Of FMLA Retaliation**

Section 2615(a)(2) of the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." § 2615(a)(2).  To make out a *prima facie* case for retaliation under § 2615(a)(2), a plaintiff must show that: (1) she was protected under the FMLA; (2) she suffered an adverse employment decision; and either (3a) that she was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because she took FMLA leave.  *Hunt*, 277 F.3d at 768 (citation omitted).  If this initial burden is met, the employer-defendant must then articulate a legitimate reason for the employment action. *Hunt*, 277 F.3d at 768.  If that is done, the employee must then show that the articulated reason was actually a pretext for retaliation. *Id.*  The plaintiff need not prove that the exercise of FMLA rights was the sole cause of the unfavorable treatment; "[t]he plaintiff is, however, required to show that the protected activity and the adverse employment action are not completely unrelated." *Mauder v. Metropolitan Transit Authority of Harris Cty., Texas*, 446 F.3d 574, 583 (5th Cir. 2006).

Borton can establish a *prima facie* case.  It is undisputed that she was protected by the FMLA (element one), that she was terminated (element two), and that she was she was treated less favorably than employees who had not requested leave under the FMLA (element three).  Specifically, regarding the third element, Borton has proof that two of the other three CDT Location Managers were alleged to have had leadership (and other) problems, and they were both given PIPs, whereas Borton was fired without the benefit of first receiving a PIP (PIP Given to

prove by a preponderance of the evidence that its decision to fire Borton had nothing to do with her rights under the FMLA, it could avoid liability for FMLA interference.  Lowe's did not come close to satisfying its burden in its Motion for Summary Judgment.

Deegan on September 18, 2017, Ex. 22; PIP Given to Norquest on February 21, 2018, Ex. 23).

Unlike Borton, neither of the two CDT Location Managers who were given PIPs were scheduled

to take FMLA at the time they were put on their plans (McIntosh Dep., Ex. 2 at 143-45; Mims

Dep., Ex. 3 at 70).   This differential treatment is sufficient to establish a *prima facie* case of

retaliation.  *See Lee v. Kansas City S. Ry. Co*., 574 F.3d 253, 259 (5th Cir. 2009) (less favorable

treatment under nearly identical circumstances establishes a *prima facie* case).

Disparate treatment aside, Borton also independently satisfies the third element of her

*prima facie* case based on the close timing – less than one month – between the date she notified

McIntosh of her need for FMLA leave by email (April 17, 2017), and the date he admittedly

decided to fire her (May 15 or 16, 2017) (Email from Borton to McIntosh of 04/17/17, Ex. 10;

McIntosh Dep., Ex. 2 at 70-71).[9]  *See Cantu v. Vitol, Inc.*, Civil Action No. H-09-0576, 2011 WL

486289, at *10 (S.D. Tex. Feb. 7, 2011) (Rosenthal, J.) (noting that "the Fifth Circuit has found

temporal proximity of up to four months sufficient to show a causal link.").  *See also Johnson v.

Fifth Third Bank*, 685 Fed. Appx. 379, 385 (6th Cir. 2017) (stating in an FMLA retaliation case

that, "the fact that there were only a few weeks between Johnson's mention of her potential leave

to Engstrom and her termination is sufficient to make a *prima facie* showing of a causal

connection."); *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171-72 (10th Cir.

2006) (where employee was terminated within four weeks of her request for FMLA leave, the

timing was close enough to establish a causal connection for purposes of a *prima facie* case).

---

[9] Although Lowe's did not implement McIntosh's decision of May 15 or 16, 2017 to fire Borton until June 6, 2017, the May 15th or 16th date is the relevant one to use for purposes of determining whether the timing is close enough to justify an inference of retaliation.  *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 241 (5th Cir. 2015) (using late June 2011 for purposes of analysis because that was when the employer made the decision to terminate the plaintiff, even though the employer did not actually fire the plaintiff until late July 2011).

### b.   Borton Has Substantial Evidence Of Pretext

Borton can also prove pretext.

#### i.   That Lowe's Gave A False Reason For Firing Borton Demonstrates Pretext

Lowe's given reason for firing Borton – that her "leadership was lacking" is false.  Her leadership was good (Borton Dep., Ex. 1 at 168-69).  She had never been told otherwise by McIntosh or anyone else (*Id*. at 135).  She had received a positive performance review at the end of January 2017 that specifically lauded her leadership in her role as the CDT Location Manager (Borton's 2016 Performance Review, Ex. 4 at #001362).  Further, there is substantial evidence that her Operations Managers believed she was a good leader, as did the overwhelming number of other employees in the facility that they spoke to (Affidavit of Melanie Fore, Ex. 28; Affidavit of Whitney Gibbs, Ex. 29; Affidavit of Richard Fontenot, Ex. 30).  McIntosh himself admits that before he fired Borton, he never documented that he believed her leadership was lacking, and he never even verbally "communicated to Borton that her leadership was lacking or unsatisfactory in any way." (McIntosh Dep., Ex. 2 at 125, 131; Lowe's Responses to ROGs, Ex. 26 at No. 7).  As such, a reasonable jury could conclude that Lowe's assertion that Borton was terminated because her "leadership is lacking" is knowingly false, which gives rise to an inference of pretext sufficient to thwart summary judgment.  *See, e.g., Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n. 10 (5th Cir. 2013) (reversing summary judgment for the employer in a discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original).

Lowe's tries to backfill for its lack of evidence by *post hoc* accusing Borton of various acts of malfeasance associated with the local cleaning service company, coffee service (and the lack of

a toaster), bathroom cleanliness,  trash buildup, and allegedly not working with her local HR Coach, Myra Jones (Lowe's Motion, Doc. 24 at 3).  As Borton explained at her deposition, and also in her attached detailed affidavit, each and every one of these allegations is either fabricated after-the-fact, stale, false, or highly disputed  (Borton Aff., Ex. 32).  While Lowe's may try to sell this grab bag of after-the-fact allegations to a jury, they cannot support a summary judgment.  *See Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 237-45 (5th Cir. 2016) (holding that lack of contemporaneous documentation, combined with swearing match over the employer's *post hoc* given reasons for termination, precluded summary judgment in a discrimination case).

Lowe's also points out that a current employee named Marquis Jelks gave a deposition in this case in 2018 in which he was critical of Borton in some respects (Lowe's MSJ, Doc. No. 24 at 9, 17-18 and Ex. 10).  Jelks' 2018 criticism is irrelevant, because the relevant inquiry is the employer's state of mind "at the time the decision was made," not after-the-fact rationalizations. *See Patrick v. Ridge*, 394 F.3d 311, 319 (5th Cir. 2004) ("As the ultimate issue is the employer's reasoning at the moment the questioned employment decision is made, a justification that could not have motivated the employer's decision is not evidence that tends to illuminate this ultimate issue and is therefore simply irrelevant . . . .").  At the time immediately before Borton's termination, it is undisputed that Jelks spoke only positively about Borton to Mims when she came to the Houston CDT (Mims' Notes from Visit to Houston CDT on 05/10/17 to 05/12/17, Ex. 14 at #000395-000396; Jelks' Dep., Ex. 10 to Lowe's MSJ, at 17-18).  Hence, Lowe's *post hoc* sleight of hand concerning Jelks backfires, and does not support its motion.

> ii.    An Analysis Of This Case Under *Ion v. Chevron* And *Laxton v. Gap* Demonstrates Pretext

This case is similar to another FMLA retaliation case where summary judgment was also not warranted.  In *Ion v. Chevron*, 731 F.3d 379, 395 (5th Cir. 2013), the Fifth Circuit observed

that when an investigation is as deeply flawed and one-sided as this one was, a reasonable jury can infer that it was not truly a search for the truth, but instead a retaliatory witch hunt designed to reach a predetermined conclusion.  In *Ion*, the Fifth Circuit reversed a summary judgment for the employer in a FMLA retaliation case because the employer's investigation was so one-sided that a reasonable jury could have concluded that it was not done in good faith, but rather was designed to conceal the employer's retaliation.

A reasonable jury could reach the same conclusion here as in *Ion*.  Within two days of Borton notifying McIntosh of her need for FMLA leave on April 17, 2017 (Email from Borton to McIntosh of 04/17/17, Ex. 5), McIntosh began digging up old, stale employee complaints from Greg Lyons and Neckia White to use against her, and, after collaborating with McIntosh, Mims showed up to her facility on May 10, 2017, and used the trip to try to stimulate more employee complaints, none of which were shared with Borton (Emails from Williams to McIntosh of 04/19/17, Exs. 11 and 12; Email from Williams to Mims and McIntosh of 04/20/17, Ex. 13; Email from Mims to McIntosh of 05/12/17, Ex. 15).  Even after McIntosh made the decision to fire Borton on May 15 or 16, 2017, he continued to use other employees to dig up dirt to use to justify the decision they had already made to fire her (Emails from Calzeretta to McIntosh of 05/18/17 and 05/19/17, Ex. 17; Emails forwarded from Mims to McIntosh of 05/19/17, Ex. 18).  During all this time, neither McIntosh, Mims, or anyone else ever asked Borton for her side of the story, or gave her a chance to respond to any of the allegations used to fire her (Borton Dep., Ex. 1 at 157-58, 165, 172, 179-80; Mims Dep., Ex. 3 at 29-30, 44; McIntosh Dep., Ex. 2 at 51-52, 62-63; Borton Aff., Ex. 32 at ¶¶ 8-12).  As in *Ion*, this is sufficient for a reasonable jury to conclude that Lowe's was not acting in good faith, but rather was out to build a case to fire Borton in retaliation for her need for upcoming FMLA leave.

Notably, the meager alleged employee complaints Lowe's has tendered hardly justify firing a nearly twenty-year employee without any prior warning or discipline. This is especially true given that Lowe's own witnesses admitted that they did not know if any of the supposed complaints about Borton were truthful or valid (McIntosh Dep., Ex. 2 at 56, 73; Mims Dep., Ex. 3 at 55). This situation is made even more suspicious by the fact that Mims had been to the Houston CDT once or twice before Borton requested FMLA leave, never took pictures before, and never reported back any problems (Mims Dep., Ex. 3 at 12-15). A reasonable jury could conclude that Mims only found such allegedly dire problems on her third trip because of Borton's recently announced need for FMLA leave. *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 43 (5th Cir. 1992) ("We find it surprising that suddenly, after Shirley filed her EEOC complaint, problems with her work surfaced.").

Furthermore, as the Court in rejecting the employer's similar argument in *Laxton v. Gap Inc*. wrote, everyone knows that "a good, strong manager will draw employee complaints." 333 F.3d 572, 581 (5th Cir. 2003). In the *Laxton* case, the Fifth Circuit affirmed a jury verdict under Title VII for the plaintiff, an ex-store manager of The Gap. The Gap had relied on complaints from subordinates as one of its articulated reasons for terminating the plaintiff. In affirming the jury verdict for the plaintiff, the Fifth Circuit state, "[u]pon consideration of all of the evidence, the jury may have reasonably concluded that Jones, Carr and Dotto solicited and exaggerated complaints from Laxton's assistant managers, issued a Written Warning and a Final Written Warning, and dispatched Inglis and Licona for store visits in an effort to compile a laundry list of violations to justify a predetermined decision to terminate Laxton." *Id*. at 582.

In other words, in *Laxton*, the Fifth Circuit found that a reasonable jury could have concluded that The Gap exaggerated run-of-the-mill complaints and then effectuated an unlawful

discriminatory "paper trail" scheme to get rid of Laxton. *Id*. As set forth above, the evidence of such an unlawful discriminatory scheme to reach a "predetermined decision to terminate [Borton]" is at least as strong in this case than it was in *Laxton*. *See also Burton*, 798 F.3d at 237 ("Evidence of a sudden and unprecedented campaign to document Burton's deficiencies and thus justify a decision that had already been made, however, could raise an inference of pretext.").

> ### iii. Here, As In *Starnes v. Wallace*, Considering "The Big Picture" There Is More Than Sufficient Proof Of Pretext To Survive Summary Judgment

In *Starnes v. Wallace*, 849 F.3d 627, 634 (5th Cir. 2017), a FLSA retaliation case, the Fifth Circuit encouraged courts to focus on the "big picture" in determining whether there was sufficient evidence of pretext to send a retaliation case to a jury. Here, in reviewing the "big picture," a reasonable jury could easily find retaliation. First, Borton testified that McIntosh never reached out to her to discuss how her position would be covered while she was out on FMLA leave (Borton Dep., Ex. 1 at 155).[10] That is very unusual – Borton testified that during her entire career, whenever anyone was going to be out for a period of time, there was always a discussion about what would be done to cover for them while they were out (Borton Dep., Ex. 1 at 156). A reasonable jury could conclude that McIntosh never talked to Borton about a plan to cover for her while she was out on leave because his intent was to build a case to fire her before she could take the leave (and thus he knew there was no point in having such a discussions with her).

Second, Mims took pictures, which Lowe's now offers the Court, during her visit to Houston on May 10-12, 2017. There is no evidence that Mims took pictures on her prior trips to Houston. And, most of the things Lowe's allegedly found so troubling from Mims' visit on May

---

[10] McIntosh disputes Borton's testimony, and claims he did discuss coverage while she was going to be on FMLA leave with her (McIntosh Dep., Ex. 2 at 46). As usual, McIntosh has no text, email, or other document to support his story (*Id*. at 46-47). As such, this boils down to a swearing match for the jury to decide. At the summary judgment stage, however, Borton's testimony, of course, must be credited over McIntosh's.

10-12, 2017, were in the same state during Mims' prior visits to the Houston CDT, yet no issue was made of them then (Borton Aff., Ex. 32 at ¶¶ 3, 5-6).   From this evidence, a reasonable jury could conclude that McIntosh did not send Mims to Houston in good faith, but rather to gather false and misleading evidence upon which he could fire Borton.

Third, on Friday, May 12, 2017, Mims told McIntosh she would ask the Employee Relations Department to conduct an Employee Advocacy Visit to more fully understand the morale at the Houston CDT (Email from Mims to McIntosh of 05/12/17, Ex. 15; Mims Dep., Ex. 3 at 46-47).   One was not done (*Id.*).   Instead, within one or two business days after Mims made that suggestion, McIntosh decided to fire Borton (McIntosh Dep., Ex. 2 at 70-71).   A reasonable jury could conclude that McIntosh did not have an Employee Advocacy Visit done, because his goal was not to more fully understand the morale at the Houston CDT, but rather to get what he could to justify firing Borton before she could take FMLA leave.

Fourth, McIntosh tried to justify his termination of Borton to Lowe's Investigator, Christopher Ropchak, by telling him that "he had multiple conversations with Borton on her Leadership . . . ." (Ropchak Investigative Report, Ex. 21 at #000409-000410).   That is false: McIntosh himself admitted that prior to June 6, 2017, he had not ever even orally "communicated to Borton that her leadership was lacking or unsatisfactory in any way." (McIntosh Dep., Ex. 2 at 125; Lowe's Responses to ROGs, Ex. 26 at No. 7).   A reasonable jury could conclude that McIntosh's false statement to Ropchak was intended to cover up his termination of her in retaliation for exercising her FMLA rights.

Fifth, at his deposition, McIntosh claimed that Borton had an unusually large number of Employee Complaints made against her through the Company's EthicsPoint Hotline – more than any of the other three CDT Location Manager (McIntosh Dep., Ex. 2 at 137).   But, Lowe's has

never produced any proof that even one complaint was made against Borton through its EthicsPoint Hotline (*Id*. at 137, 141-42). And, Mims – an HR Director – testified that she has never seen even one such complaint against Borton (Mims Dep., Ex. 3 at 17). A reasonable jury could conclude that McIntosh made up this false allegation too, as part of his continuing *post hoc* effort to falsely portray Borton as being a poor leader, so as to cover up his termination of her in retaliation for exercising her FMLA rights. In short, looking at the "big picture" here, summary judgment is not proper. *See Starnes*, 849 F.3d at 634 (reversing summary judgment in a retaliation case); *Caldwell*, 850 F.3d at 246 (reversing summary judgment for the employer in an FMLA case because there was sufficient evidence of pretext).

### iv.    Timing Also Proves Pretext

McIntosh made the decision to fire Borton just one month after she first brought her need for FMLA leave to his attention, and just nine days before the leave was to begin (Lowe's Responses to RFAs, Ex. 25 at 53; McIntosh Dep., Ex. 2 at 70-71, 92-94). It is suspicious that – after almost twenty years at Lowe's – Borton's leadership was only found allegedly "lacking" almost immediately after she requested FMLA leave, and was just about to start the leave. Fifth Circuit precedent provides that, "[t]he combination of close timing with other significant evidence of pretext, can be sufficient to survive summary judgment." *Burton*, 798 F.3d at 240 (citations omitted). In this case, there is plenty of other "significant evidence of pretext." *See supra*. As such, summary judgment is not appropriate. The timing related evidence of pretext is especially compelling here because McIntosh made the decision to fire Borton for supposed "lack of leadership" less than four months after she received a positive 2016 performance review that specifically lauded her leadership (Borton's 2016 Performance Review, Ex. 4 at #001363; McIntosh Dep., Ex. 2 at 70-71). *Cf. Shirley*, 970 F.2d at 43 ("We find it surprising that suddenly, after Shirley filed her EEOC complaint, problems with her work surfaced.").

### v.    Disparate Treatment (Further) Proves Pretext

Even assuming solely for the sake of argument that Lowe's really believed in good faith that Borton's leadership was lacking, summary judgment would still be improper because of the proof of disparate treatment.  Specifically, when McIntosh believed that two of the other three CDT Location Managers had leadership (and other) problems, they were given PIPs, whereas Borton was fired without the benefit of first receiving a PIP (PIP Given to Deegan on September 18, 2017, Ex. 22; PIP Given to Norquest on February 21, 2018, Ex. 23).   Borton was schedule to take FMLA leave at the relevant time, whereas the other two CDT Location Managers who were given PIPs were not (McIntosh Dep., Ex. 2 at 143-45; Mims Dep., Ex. 3 at 70).  This disparate treatment gives rise to an inference of pretext sufficient to thwart summary judgment.  *See Wheat v. Florida Parish Juvenile Justice Comm*., 811 F.3d 702, 711 (5th Cir. 2016) (holding in an FMLA retaliation case that, "the Commission's inconsistent treatment of Wheat raises disputed issues of material fact as to whether:  but for exercising her rights she would have been discharged.").

Lowe's struggles to distinguish Borton from the other two CDT Location Managers who received PIPs (Lowe's Motion, Doc. No. 24 at 19-20).  Lowe's asserts that, unlike Borton, Norquest had received a poor rating on her most recent annual performance review (*Id*. at 19).  If anything, that makes giving her a PIP, but firing Borton, even more clearly retaliatory, and further bolsters Borton's point that Lowe's normal practice is to coach allegedly poor performing managers, and give them PIPs, before proceeding to termination (Borton Dep., Ex. 1 at 178).  *See EEOC v. Chevron Phillips Chemical Co.*, LP, 570 F.3d 606, 623-24 (5th Cir. 2009) (reversing summary judgment in part because the fact that the employer went to immediate termination, rather than following its normal progressive disciplinary practice, suggested pretext).

Second, Lowe's purported distinction that, unlike with Borton, there is no evidence that employees complained about Deegen or Norquest, is insufficient to defeat Borton's disparate

treatment claim because: (a) there is no contemporaneous evidence from April, May, or June 2017 that any such alleged difference actually drove the decision to fire Borton; rather, as usual, there is only McIntosh's *post hoc*, uncorroborated, self-interested testimony from 2018 to support Lowe's argument here, which is not good enough, *see Lee*, 574 F.3d at 261 n. 27 ("The relevant perspective is that of the employer *at the time of the adverse employment decision*.") (italics added); (b) Lowe's suspiciously went to Borton's CDT and stimulated the alleged complaints – which is easy to do in a warehouse facility filled with low-paid hourly workers – yet there is no evidence that Lowe's went to Norquest's or Deegen's CDTs to do the same; (c) Lowe's itself admits that it does not know if any of the alleged complaints were even valid (McIntosh Dep., Ex. 2 at 56, 73; Mims Dep., Ex. 3 at 55); (d) Lowe's never asked Borton about the alleged complaints, to get her side of the story, before firing her (Borton Aff., Ex. 32 at ¶¶ 8-12; Borton Dep., Ex. 1 at 157-58, 165, 172, 179-80; Mims Dep., Ex. 3 at 29-30, 44; McIntosh Dep., Ex. 2 at 51-52, 62-63); and (e) Borton sought such complaints concerning other CDT Location Managers from Lowe's in discovery, and Lowe's did not claim that none existed.  Instead, Lowe's objected, and never produced them (Excerpts of Lowe's Responses to Borton's Second RFPs, Ex. 31 at Nos. 31-32). Lowe's similarly failed to produce other relevant evidence.  *See supra* fn. 3.

## V.   <u>CONCLUSION</u>

There is ample evidence from which a reasonable jury could conclude that Lowe's sudden termination of Borton on charges that she "lacked leadership" after nearly twenty years of employment – and just nine days before her scheduled surgery and FMLA leave – was in violation of the FMLA's anti-interference and anti-retaliation provisions.  *See* 29 U.S.C. § 2601 *et seq*.  As such, Lowe's motion for summary judgment must be denied.

Respectfully submitted,

OBERTI SULLIVAN LLP

By:   s/ Mark J. Oberti

Mark J. Oberti
State Bar No. 00789951
S.D. Texas No. 17918
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
mark@osattorneys.com – Email

ATTORNEY-IN-CHARGE FOR PLAINTIFF

OF COUNSEL

Edwin Sullivan
State Bar No. 24003024
S.D. Texas No. 24524
OBERTI SULLIVAN LLP
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF COMPLIANCE

In accordance with Judge Gray Miller's Procedures, a true and correct copy of the foregoing is being delivered to Chambers upon filing.

s/ Mark J. Oberti
Mark J. Oberti

-31-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served upon the counsel of record listed below via ECF service on the 14th day of September 2018.

Holly Williamson
Hunton Andrews Kurth LLP
Bank of America Center
Suite 4545
700 Louisiana Street
Houston, TX 77002

<u>s/ Mark J. Oberti</u>
Mark J. Oberti

## VI.   <u>INDEX OF EXHIBITS</u>

| DESCRIPTION OF EXHIBITS | EXHIBIT |
|---|---|
| Michele Borton's Deposition Transcript | 1 |
| Brian McIntosh's Deposition Transcript | 2 |
| Machell Mims' Deposition Transcript | 3 |
| Michele Borton's 2016 Performance Management Plan | 4 |
| Email from Borton to McIntosh of 04/05/17 | 5 |
| All Texts Borton Had Between Herself and McIntosh | 6 |
| Emails between Borton and McIntosh Between 04/06/17 and 05/12/17 | 7 |
| ReedGroup Notice of FMLA Eligibility To Borton of 04/11/17 for Leave Starting 06/01/17 | 8 |
| FMLA Certification Information Sent from Borton to ReedGroup on 04/28/17 | 9 |
| Email from Borton to McIntosh of 04/17/17 | 10 |
| Email from Williams to McIntosh with a copy to Mims of 04/19/17 | 11 |
| Email from Williams to McIntosh and Mims of 04/20/17 | 12 |
| Email from Williams to McIntosh and Mims of 04/20/17 | 13 |
| Mims' Notes from Visit to Houston CDT on 05/10/17 to 05/12/17 | 14 |
| Email from Mims to McIntosh of 05/12/17 | 15 |
| Email from McIntosh to Mims of 05/16/17 | 16 |
| Emails from Mike Calzeretta to McIntosh of 05/18/17 and 05/19/17 | 17 |
| Email from Mims to McIntosh of 05/19/17 | 18 |

| | |
|---|---|
| ReedGroup Notice of FMLA Eligibility To Borton of 06/01/17 for Leave Starting 06/15/17 | 19 |
| Employee Corrective Action Report Reflecting Borton's Termination on 06/06/17 | 20 |
| Christopher Ropchack's Investigate Report of Borton's Retaliation Complaint | 21 |
| Eric Deegan's PIP | 22 |
| Brittany Norquest's PIP | 23 |
| Letter from Oberti to McCanless of 06/30/17 | 24 |
| Lowe's Responses to Plaintiff's Requests for Admissions | 25 |
| Lowe's Responses to Plaintiff's Interrogatories | 26 |
| Emails from Oberti to Williamson Requesting a Verification for Lowe's Responses to Plaintiff's Interrogatories Nine Times (Despite Several Promises To Do So, For More Than Eight Months Lowe's Failed And Refused To Provide A Verification Until Seven Days Ago (See Ex. 33) | 27 |
| Affidavit of Melanie Fore | 28 |
| Affidavit of Whitney Gibbs | 29 |
| Affidavit of Richard Fontenot | 30 |
| Excerpts of Lowe's Responses to Borton's Second RFPs | 31 |
| Affidavit of Michele Borton | 32 |
| Lowe's Supplemental Responses to Plaintiff's Interrogatories, Served Seven Days Ago | 33 |

Note:  Borton's response is 30 pages because she filed an unopposed motion for leave to exceed the normal page limit by five pages (Doc. No. 25).  If the motion is denied, Borton requests leave to refile a response of 25 pages.